UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

EMPLOYEES' RETIREMENT SYSTEM OF  :  Civil Action No. 13 CV 9125
THE GOVERNMENT OF THE VIRGIN        :
ISLANDS, Individually and on Behalf of All  :  CLASS ACTION
Others Similarly Situated,                      :
                                                          :  COMPLAINT FOR VIOLATIONS OF THE
                        Plaintiff,                   :  SHERMAN ACT
                                                          :
            vs.                                          :
                                                          :
BARCLAYS BANK PLC, CITIGROUP INC.,  :
CITIBANK, N.A., CREDIT SUISSE GROUP  :
AG, CREDIT SUISSE SECURITIES (USA)   :
LLC, DEUTSCHE BANK AG, THE             :
GOLDMAN SACHS GROUP, INC.,              :
JPMORGAN CHASE & CO., JPMORGAN     :
CHASE BANK, NATIONAL                       :
ASSOCIATION, THE ROYAL BANK OF        :
SCOTLAND GROUP PLC, UBS AG, UBS        :
SECURITIES LLC, HSBC HOLDINGS PLC    :
and HSBC BANK USA, N.A.,                     :
                                                          :
                        Defendants.                :

—————————————————————————— x   DEMAND FOR JURY TRIAL

Plaintiff Employees' Retirement System of the Government of the Virgin Islands ("Plaintiff"), individually and on behalf of a Class (as defined below) of all others similarly situated who engaged in foreign currency transactions with one or more of the defendants during the period January 1, 2006 to the present ("Class Period"), brings this antitrust class action for treble damages and injunctive relief under the laws of the United States against defendants to remedy violations of §1 of the Sherman Act, 15 U.S.C. §1, and for unjust enrichment. Specifically, Plaintiff asserts claims under §1 of the Sherman Act against defendants for engaging in a conspiracy to manipulate and unreasonably restrain trade in the foreign exchange ("FX" or "FOREX") market. Government and regulatory investigations, including by the Criminal Division of the U.S. Department of Justice ("DOJ"), the Federal Bureau of Investigation and the Commodity Futures Trading commission ("CFTC"), as well as by the European Union Competition authorities, Switzerland's Financial Market Supervisory Authority ("FINMA"), the United Kingdom's Financial Conduct Authority ("FCA"), the Hong Kong Monetary Authority ("HK-MA") and Monetary Authority of Singapore ("SG-MA"), will provide further information from defendants' internal records or personnel that bears significantly on Plaintiff's claims. Based on such information from other investigations, Plaintiff's personal knowledge, and upon information and belief, Plaintiff alleges as follows:

## SUMMARY OF THE ACTION

1.      This is a class action brought to remedy defendants' violations of the federal antitrust laws and recover for injuries to Plaintiff and the Class. This is an action to recover damages caused by defendants' anticompetitive scheme to manipulate the FOREX market so they could reap enormous financial gains by overcharging and underpaying other market participants that lacked the information, insider status, and market clout wielded by the defendants herein.

2.      The FOREX market is the largest and most liquid market in the world. It is also highly concentrated and susceptible to collusion, being controlled by a group of fewer than 100

individual traders at just a handful of banks. According to a May 2013 survey by Euromoney Institutional Investor Plc., Deutsche Bank AG maintains a 15% share of the market, followed by Citigroup Inc. with almost 15% and London-based Barclays Bank PLC and Switzerland's UBS AG, which both have 10%. And, as an over-the-counter market where brokers/dealers negotiate directly with one another, the FOREX market lacks a central exchange or clearing house.

3. Participants in the FOREX market include large banks, central banks, pension funds and institutional investors, currency speculators, corporations, governments, and retail investors. The WM/Reuters Closing Spot Rates service ("WM/Reuters"), which provides a standardized method for determining daily exchange rates for 160 different currencies, are used by fund managers worldwide to compute the value of holdings and by index providers such as the FTSE Group and MSCI Inc., which track stocks and bonds in multiple countries.

4. For at least the last decade, many of the world's leading banks and financial institutions engaged in a global conspiracy to manipulate the $5.3 trillion-a-day market in foreign currency by rigging the market for exchange rates. Defendants' violations are twofold: (i) traders "banged the close," or pushed through orders during pricing windows to manipulate the FOREX prices;[1] and (ii) traders shared information on message boards and chat rooms with monikers such as "The Cartel" and "The Bandits' Club" about their clients' big pending orders that might move the benchmark.

5. Acting jointly and in concert, defendants and their senior traders colluded to manipulate the currency "fixes" – daily snapshots of trading used globally by investment managers to value portfolios – in order to maximize profits and minimize losses. These banks and their senior traders routinely shared information about client orders, through instant messages and chat rooms,

---

[1] Because the 4 p.m. benchmark rate is calculated in just a 60-second window, the rate is manipulated via a process known as "banging the close."

and agreed to the sequence for placing their own trades to manipulate the FOREX market to their advantage. This concerted manipulation allowed traders to front-run client orders and rig WM/Reuters rates by pushing through large numbers of trades before and during the 60-second measurement windows when the benchmarks are set.

6. For example, according to a June 12, 2013 *Bloomberg* report, a trader with more than a decade of experience explained that if he received an order at 3:30 p.m. to sell 1 billion euros ($1.3 billion) in exchange for Swiss francs at the 4 p.m. fix, he would have two objectives: to sell his own euros at the highest price and also to move the rate lower so that at 4 p.m. he could buy the currency from his client at a lower price. The trader would then profit from the difference between the reference rate and the higher price at which he sold his own euros, the *Bloomberg* investigation revealed. A move in the benchmark of 2 basis points, or 0.02%, would be worth 200,000 francs ($216,000).

7. This manipulative behavior, which undermines how money is accurately valued, occurred daily for at least the last decade, affecting the value of currencies, funds and derivatives worldwide.

8. Defendants' anticompetitive practices and manipulation of WM/Reuters rates are currently the subject of investigation by numerous authorities throughout the world. In the United States, the DOJ has publicly confirmed that "the criminal and antitrust divisions have an active, ongoing investigation into possible manipulation of foreign-exchange rates," while the CFTC has a separate ongoing regulatory investigation. In Europe, the United Kingdom's FCA and the Swiss FINMA are investigating. And, in Asia, the HK-MA and the SG-MA have opened investigations. These global authorities are investigating allegations of collusion, looking into whether dealers and traders cut secret deals for personal profit before completing customers' orders and have requested

documents from the defendants, including instant messages and chat room discussions between members of "The Bandits' Club" and "The Cartel" regarding their fixing of WM/Reuters rates. To date, at least a dozen currency traders have been suspended or placed on leave as a result of investigations into trading manipulations. And, in the wake of these investigations, numerous banks, including defendants Goldman Sachs, UBS, RBS, Citigroup, Deutsche Bank and JPMorgan have banned traders from using multibank chat rooms.

## VENUE AND JURISDICTION

9.     This action is instituted under §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against defendants for the injuries sustained by Plaintiff and the members of the Class by virtue of defendants' violations of §1 of the Sherman Act, 15 U.S.C. §1, and to enjoin further violations. This Court has jurisdiction over the subject matter of this action under §§4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26, and under 28 U.S.C. §§1331 and 1337.

10.     This Court has personal jurisdiction over each of the defendants by virtue of their business activities in this District.

11.     Venue is appropriate in this District under §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period the defendants resided or transacted business in this District, and because a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

12.     The activities of defendants and their co-conspirators were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

# PARTIES

**Plaintiff**

13.     Plaintiff Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") is a defined benefit pension plan for officials and employees of the Government of the Virgin Islands and for their dependents and beneficiaries. It is one of the oldest pension systems under the American flag. During the Class Period, the Virgin Islands participated in the FOREX market and engaged in FOREX transactions directly with one or more of defendants. The Virgin Islands has been injured in its business or property as a result of defendants' manipulative conduct and violations of law alleged herein.

**Defendants[2]**

14.     Defendant Barclays Bank PLC ("Barclays") is a British public limited company headquartered at 1 Churchill Place, London E14 5HP, England. Barclays is licensed by the New York Department of Financial Services ("NYDFS") with a registered address at 745 Seventh Avenue, New York, New York 10019, and a foreign representative office at One MetLife Plaza, 27-01 Queens Plaza North, Long Island City, New York 11101.

(a)     Barclays is a global financial services firm which participates in the FOREX market. Together with the other defendants, Barclays conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(b)     Barclays confirmed an internal investigation into the trading activity by employees as part of the global foreign exchange probe, reviewing records going back several years. In a statement released with its quarterly results on October 30, 2013, Barclays stated: "Barclays

---

[2]     Whenever in this Complaint reference is made to any act, deed, or transaction of any entity or corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

Bank has received enquiries from certain of these authorities related to their particular investigations, is reviewing its foreign exchange trading covering a several year period through August 2013 and is co-operating with the relevant authorities in their investigations." The BBC reported on November 1, 2013 that Barclays suspended six currency traders as part of the probe into currency manipulation.

15.     Defendant Citigroup Inc. is a Delaware corporation headquartered at 399 Park Ave, New York, New York 10022. Defendant Citibank, N.A. is federally-chartered national banking association headquartered at 399 Park Avenue, New York, New York 10022, and is a wholly owned subsidiary of Citigroup Inc. Citigroup Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citigroup."

(a)     Citigroup is a global financial services firm which participates in the FOREX market. Together with the other defendants, Citigroup conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(b)     Citigroup Inc. confirmed in its third-quarter earnings report on November 1, 2013, that its FOREX trading is under investigation, stating that "[g]overnment agencies in the U.S. and other jurisdictions are conducting investigations or making inquiries regarding trading on the foreign-exchange markets," and that "Citigroup has received requests for information and is cooperating with the investigations and inquiries and responding to the requests." According to a *Bloomberg* report, Citigroup Inc.'s head of European spot trading, Rohan Ramchandani, was placed on leave in the wake of the global regulatory investigation into currency manipulation.

16.     Defendant Credit Suisse Group AG is a Swiss Company based in Zurich, Switzerland and headquartered at Paradeplatz 8, CH 8001 Zurich, Switzerland. Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company headquartered 11 Madison Avenue, New York, New York 10010, and is a wholly-owned subsidiary of Credit Suisse Group

AG. Credit Suisse Group AG and Credit Suisse Securities (USA) LLC are collectively referenced in this complaint as "Credit Suisse."

(a)      Credit Suisse is a global financial services firm which participates in the FOREX market. Credit Suisse, together with the other defendants, conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(b)      Urs Rohner, Chairman of Credit Suisse Group AG, confirmed to a Swiss newspaper that the bank had received inquiries from authorities surrounding the currency probe: "As is normal with such large-scale investigations, we have also received inquiries from certain authorities, as is the same for other banks. That is normal procedure, it was also like this with Libor."

17.      Defendant Deutsche Bank AG ("Deutsche Bank") is a global financial services firm which participates in the FOREX market. Together with the other defendants, Deutsche Bank conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(a)      Deutsche Bank is a German financial services company headquartered in Frankfurt, Germany. Deutsche Bank is licensed by the NYDFS with a registered address at 60 Wall Street, New York, New York 10005.

(b)      Deutsche Bank confirmed that it was cooperating with regulators regarding probes into manipulation of the FOREX market, and had set aside $1.7 billion for potential litigation. *Bloomberg* reports that Deutsche Bank is among the firms reviewing emails, instant messages and employee records for evidence of manipulation after receiving requests for information from the United Kingdom's FCA.

18. Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs"), a Delaware corporation headquartered at 200 West Street, New York, New York 10282, is a global financial services firm which participates in the FOREX market. Together with the other defendants, Goldman Sachs conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(a) Goldman Sachs provides investment banking, securities, and investment management services to a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals.

(b) In a November 7, 2013 filing, Goldman Sachs disclosed that it was under investigation by regulators probing FOREX manipulations and that investigators were focused on the firm's "trading activities and communications in connection with the establishment of benchmark rates." Additionally, *Bloomberg* reported on December 20, 2013, that Goldman Sachs has joined its co-defendants in banning traders from using chat rooms involving traders from more than one other bank.

19. Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered at 270 Park Ave., 38th Floor, New York, New York 10017. Defendant JPMorgan Chase Bank, National Association, is a federally chartered national banking association headquartered at 270 Park Avenue, 38th Floor, New York, New York 10017, and is a wholly-owned subsidiary of JPMorgan Chase & Co. JPMorgan Chase & Co. and JPMorgan Chase Bank, National Association are collectively referenced in this Complaint as "JPMorgan."

(a) JPMorgan is a global financial services firm which participates in the FOREX market. Together with the other defendants, JPMorgan conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(b)      JPMorgan Chase & Co. confirmed in a regulatory filing with the SEC that government authorities were investigating its currency trading business, stating: "These investigations are in the early stages and the firm is cooperating with the relevant authorities." *Bloomberg* reported that Richard Usher, JPMorgan's chief dealer in London, went on leave following probes into the FOREX rate manipulation. The *Financial Times* reports that "[s]eparately, JPMorgan said it made money trading on every day in the quarter, an unusual feat for an investment bank. After losing more than $6bn last year trading credit derivatives, JPMorgan recorded no days of losses in the past three months and at least one day where it made more than $200m in profit."

20.      Defendant The Royal Bank of Scotland Group plc ("RBS") is a global financial services firm which participates in the FOREX market. Together with the other defendants, RBS conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(a)      RBS is a United Kingdom public limited company headquartered in Edinburgh, Scotland. RBS is licensed by the NYDFS with a registered address at 101 Park Avenue, New York, New York 10178.

(b)      RBS has reportedly suspended two traders in connections with an investigation into FOREX rate manipulation. And on November 1, 2013, RBS revealed in its third quarter earnings statement that it had received inquiries from various financial regulatory agencies including the FCA. RBS stated that it "is reviewing communications and procedures relating to certain currency exchange benchmark rates as well as foreign exchange trading activity and is cooperating with these investigations." *USA Today* reports that that RBS listed the FOREX investigation and other trading probes as risk factors that could materially affect its future financial results. According to published reports, RBS has handed over records of instant messages to U.K.

regulators after concluding a former currency trader's communications with counterparts at other firms may have been inappropriate. According to the article, the messages related to the dealer's trading positions. The chats were uncovered following an internal investigation.

21.     Defendant UBS AG is a Swiss Company based in Basel and Zurich, Switzerland. Defendant UBS Securities LLC is a Delaware limited liability company headquartered at 677 Washington Blvd, Stamford, Connecticut 06901, and is a wholly-owned subsidiary of UBS AG. UBS AG and UBS Securities LLC are referred to collectively in this Complaint as "UBS."

(a)     UBS is a global financial services firm which participates in the FOREX market. Together with the other defendants, UBS conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(b)     *The Wall Street Journal* reports that UBS acknowledged that Swiss, U.S. and U.K. regulators had launched investigations, and that UBS and other banks had "received requests from various authorities relating to their foreign exchange businesses." UBS's quarterly earnings report, published on October 29, 2013, revealed that the bank had launched an internal probe of its FOREX business, following reports of "widespread irregularities in the foreign exchange markets," and that it claims it has "taken and will take appropriate action with respect to certain personnel as a result of our review, which is ongoing." *CNBC* reported that "UBS shares fell almost 8 percent following news that the Swiss regulator FINMA had imposed a temporary 50 percent increase in the amount of capital the bank holds against risk weighted assets, to cover potential costs of unknown legal probes."

22.     Defendant HSBC Holdings plc is a British Company, headquartered in London at 8 Canada Square, London E14 5HQ, England. Defendant HSBC Bank USA, N.A., headquartered in New York, is the principal subsidiary of HSBC USA Inc., an indirect, wholly-owned subsidiary of

HSBC North America Holdings Inc. USA, N.A. HSBC Holdings plc and HSBC Bank USA, N.A. are collectively referred to as "HSBC."

(a)     HSBC is a global financial services firm which participates in the FOREX market. Together with the other defendants, HSBC conspired to and did unreasonably restrain trade and commerce by manipulating the spot prices for FOREX rates.

(b)     HSBC Holdings plc has admitted to cooperating in the global investigation into possible currency manipulation in a statement issued on November 4, 2013, which stated: "The Financial Conduct Authority is conducting investigations alongside several other agencies in various countries into a number of firms, including HSBC, relating to trading on the foreign exchange market. We are co-operating with the investigations, which are at an early stage."

## CLASS ALLEGATIONS

23.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following "Class":

> All persons or entities who engaged in foreign currency transactions directly with a defendant during the period January 1, 2006 through the present ("Class Period"), which transactions were settled on the bases of WM/Reuters rates. Excluded from the Class are defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; any affiliate, legal representative, heir or assign of any defendant, and any person acting on their behalf.

24.     The Class, as defined above, meets each of Rule 23's prerequisites.

25.     Identifiable Members: The Class is readily identifiable and is one for which records should exist.

26.     Numerosity: Due to the nature of the trade and commerce involved, Plaintiff believes that there are hundreds or thousands of Class members as above described, the exact number and their identities being known to defendants and their co-conspirators.

27.     Typicality: Plaintiff's claims are typical of the claims of the members of the Class because, like other members of the Class, Plaintiff directly engaged in trades that were settled on the basis of WM/Reuters rates and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

28.     Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

(a)     whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of foreign currency in interstate commerce in the United States;

(b)     the identity of the participants of the alleged conspiracy;

(c)     the duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

(d)     whether the alleged conspiracy violated §1 of the Sherman Act, 15 U.S.C. §1;

(e)     whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other members of the Class;

(f)     the effect of defendants' alleged conspiracy on the prices of foreign currency during the Class Period;

(g)     the appropriate class-wide measure of damages; and

(h)     the appropriate nature of class-wide injunctive or other equitable relief.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

29.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiff has retained competent counsel experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

30.     Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual joinder of all damaged Class members is impracticable. Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

31.     Defendants' unlawful acts alleged in this Complaint had a substantial effect on interstate commerce and caused antitrust injury to Plaintiff and the Class.

32.     Defendants' unlawful acts had the purpose and effect of manipulating the WM/Reuters rates.

33.     As a direct result of defendants' violations, Plaintiff and the members of the Class have been damaged in their property or business.

34.     As a direct and foreseeable result of defendants' unlawful anticompetitive acts, the spot FOREX benchmark was manipulated.

## THE FOREIGN EXCHANGE MARKET

35.     The FOREX market is a global decentralized market for the trading of currencies. According to a Bank for International Settlements survey published in September, about $5.3 trillion changes hands every day, as companies convert earnings into dollars, euros or yen and managers overseeing pensions and savings buy and sell shares around the world.

36.     The FOREX market is not a market in the traditional sense because there is no central trading location or "exchange." Most of the trading is conducted by telephone or through electronic trading networks and the market operates 24 hours a day, 5 days a week.

37.     Foreign currency exchange rates reflect the costs in one country for another country's currency. Currencies are designated by three letter symbols. The standard symbols for some of the most commonly traded currencies are:

- EUR – Euros

- USD – United States dollar

- CAD – Canadian dollar

- GBP – British pound

- JPY – Japanese yen

- AUD – Australian dollar

- CHF – Swiss franc

38.     FOREX transactions are quoted in pairs, e.g., EUR/USD, because they comprise buying one currency while selling another. The first currency is the base currency and the second currency is the quote currency. The price, or rate, that is quoted is the amount of the second currency required to purchase one unit of the first currency. For example, if EUR/USD has an ask price of 1.2178, you can buy one Euro for 1.2178 US dollars.

39.     Currency pairs are often quoted as bid-ask spreads. The first part of the quote is the amount of the quote currency you will receive in exchange for one unit of the base currency (the bid price) and the second part of the quote is the amount of the quote currency you must spend for one unit of the base currency (the ask or offer price). In other words, a EUR/USD spread of 1.2170/1.2178 means that you can sell one Euro for $1.2170 and buy one Euro for $1.2178.

40.     A dealer may not quote the full exchange rate for both sides of the spread. For example, the EUR/USD spread discussed above could be quoted as 1.2170/78.

**The WM/Reuters Rates**

41.     Introduced in 1994, the WM/Reuters rates provide a standardized set of currency benchmark rates so that portfolio valuations could be compared with each other and their performance measured against benchmarks without having any differences caused by exchange rates. The WM/Reuters rates have become the *de facto* standard for closing spot rates on a global basis and are used by fund managers to determine what they pay for currencies and to compute the day-to-day value of their holdings.

42.     The WM/Reuters rates have also been adopted by index compilers who track stocks and bonds in multiple countries. Indeed, the majority of the main equity and bond index compilers, including Citigroup Global Markets Ltd, FTSE International Ltd, International Index Co, IPD (International Property Database), JP Morgan Securities Ltd, Merrill Lynch, Pierce, Fenner &Smith Inc., Morgan Stanley Capital International Ltd, OMX (Stockholm Stock Exchange Ltd), Standard & Poors, and Stoxx LTD use WM/Reuters rates in their calculations.

43.     However, other uses of the rates have developed and are becoming increasingly important. Many customers now use the rates as a benchmark for currencies in contracts of different kinds, including the settlement of financial derivatives, as companies and other consumers need FX rates to value currency holdings at a uniform rate. Many banks guarantee that they will trade at the

WM/Reuters rates, and this guarantee is useful for investors if they are making changes to a portfolio benchmarked against an index that uses the WM/Reuters rates.

44.    While the rates are not typically followed by most investors, even small movements can affect the value of the trillions in funds including pension and savings accounts that track global indexes. As described by Tom Kirchmaier, a fellow in the financial-markets group at the London School of Economics, "The price mechanism is the anchor of our entire economic system. . . . Any rigging of the price mechanism leads to a misallocation of capital and is extremely costly to society."

45.    The rates are published hourly for 160 currencies and half-hourly for 21 of them. For the 21 major currencies from the British pound to the South African rand, the benchmarks are the median of all trades in a minute-long period called "the fix," starting 30 seconds before the beginning of each half-hour. When there is an insufficient volume of transactions between a pair of currencies during the reference period, the rate is based on the median of traders' orders, which are offers to sell or bids to buy. Rates for the other, less-widely traded currencies are calculated using quotes during a two-minute window.

46.    As explained by The WM Company, WM/Reuters rates are calculated for trade currencies as follows:[3]

> Over a one-minute fix period, bid and offer order rates from the order matching systems and actual trades executed are captured every second from 30 seconds before to 30 seconds after the time of the fix. Trades are identified as a bid or offer and a spread is applied to calculate the opposite bid or offer.

> Using valid rates over the fix period, the median bid and offer are calculated independently and then the mid rate is calculated from these median bid and offer rates, resulting in a mid trade rate and a mid order rate. A spread is then applied to calculate a new trade rate bid and offer and a new order rate bid and offer. Subject to

---

[3]    WM/Reuters, *Spot & Forward Rates Methodology Guide* §2.4.2, *available at* http://www.wmcompany.com/pdfs/026808.pdf.

a minimum number of valid trades being captured over the fix period, these new trade rates are used for the fix; if there are insufficient trade rates, the new order rates are used for the fix.

47.     Unlike sales of stocks and bonds, which are regulated by government agencies, the spot foreign exchange – the buying and selling for immediate delivery as opposed to some future date – is not considered an "investment product" and is not subject to specific rules. And, while the benchmarks are based on actual trades or quotes, rather than the bank estimates used to calculate benchmarks such as Libor, they are still highly susceptible to rigging, according to traders who explained to *Bloomberg* that they had engaged in or witnessed the practice. A lack of regulation has left the FOREX market vulnerable to abuse. According to Rosa Abrantes-Metz, a professor at New York University's Stern School of Business in Manhattan, "If nobody is monitoring these benchmarks, and since the gains from moving the benchmark are possibly very large, it is very tempting to engage in such a behavior." Abrantes-Metz notes that "[e]ven a little bit of difference in price can add up to big profits."

**The Market is Dominated By Four Firms**

48.     While hundreds of firms participate in the FOREX market, four banks dominate, with a combined share of more than 50%. Deutsche Bank is No. 1 with a 15.2% share, followed by Citigroup with 14.9%, Barclays with 10.24% and UBS with 10.1%.

49.     According to *EuroMoney 2013 FX Poll Results*, defendants had the following market shares, and collectively controlled 84.25% of the FOREX market:

| EuroMoney FX Poll | 2013 Market Share % | 2012 Market Share % |
|---|---|---|
| Deutsche Bank | 15.18% | 14.56% |
| Citgroup | 14.90% | 12.26% |
| Barclays | 10.24% | 10.95% |
| UBS | 10.11% | 10.48% |
| HSBC | 6.93% | 6.72% |
| JPMorgan | 6.07% | 6.60% |
| RBS | 5.62% | 5.86% |
| Credit Suisse | 3.70% | 4.68% |
| Morgan Stanley | 3.15% | 3.52% |
| Bank of America | 3.08% | 2.41% |
| Goldman Sachs | 2.75% | 3.12% |
| BNP Paribas | 2.52% | 2.63% |

## DEFENDANTS' MANIPULATIVE AND ANTICOMPETITIVE CONDUCT

50.    The FOREX market, while tremendous in size, is largely unregulated.  The top institutions, as detailed above, control the market and the structure is such that investors have little access to important pricing information.  The United States does not have rules in place regarding spot or FOREX trading, and the Dodd-Frank Act exempts forward foreign currency transactions from its purview.  Similarly, U.K. regulators require dealers to act with integrity to avoid conflicts, but there are no specific rules or agencies governing spot foreign exchange trading in the United Kingdom or United States.  Spot foreign exchange transactions are not considered "financial instruments," so they also fall outside the European Union's Markets in Financial Instruments Directive, or "MiFID," which requires dealers to take all reasonable steps to ensure the best results for clients.  Traders refer to the FX market as the "Wild West," a reference that the market is one of the least regulated.

51.    Defendants are horizontal competitors across a wide range of activities in the financial services markets, including FOREX transactions settled according to the WM/Reuters

rates. Defendants compete against each other to attract customers, including those that trade FX, and ostensibly compete amongst themselves with respect to proprietary trading of currencies.

52. Dealers enter into mirror-image, or off-setting, trades because of the need to eliminate overnight risk. At the same time, however, all major foreign currency dealers must engage in trades at the WM/Reuters rates because of the volume of business from ETFs, pension funds, municipal funds, and endowment funds that demand these trades. Because traders promise their clients that they will get the fix price, and are supposedly obligated to provide "best execution" on transactions, banks are left open to potential losses if the market moves against them. Trading at the fix, however, is viewed by the banks as a loss-leader that helps win and maintain client business. FX dealers and traders seek to avoid such unrestrained market movements, however, by collectively manipulating the WM/Reuters rates.

53. To make money, traders said they would exchange information with counterparts at other firms and trade ahead of large client orders. Most "tracker funds," which specifically follow a certain market segment, place their orders as much as an hour before the fix, giving dealers a glimpse of possible future price movements, which they can use to take positions for their own profit. Traders on instant message and multibank chat groups increased their chances of predicting market moves by pooling or exchanging details of their order books and agreeing to align positions at the fix, according to three people with knowledge of the practice.

54. Index funds, which manage approximately $3.6 trillion according to Morningstar Inc., typically place the bulk of their orders with banks on the last day of the month as they adjust rolling currency hedges to reflect relative movements between equity indexes in different countries and invest inflows from customers over the previous 30 days. Most requests are placed in the hour

preceding the 4 p.m. London window, and banks agree to trade at the benchmark rate, regardless of later price moves.

55.     Because the 4:00 p.m. benchmark determines how much profit dealers can make on the positions they have taken in the preceding hour, there is a tremendous incentive to influence the rate. According to *Bloomberg*, for ten major currency pairs, the minutes surrounding the 4:00 p.m. London close are the busiest for trading at the end of the month, quarter and year.

56.     By concentrating orders in the moments before and during the 60-second window, traders exert tremendous pressure on the WM/Reuters rates and push the rates up or down, a process known as "banging the close."[4] And because the benchmark is based on the median value of transactions during the period, breaking up orders into a number of smaller trades could have a greater impact than executing one big deal. Traders would also share details of orders with brokers and counterparts at banks through instant messages and chat groups to align their strategies and glean information about impending trades to improve their chances of getting the desired move in the benchmark.[5]

57.     By way of example, in a span of 20 minutes on June 28, 2013 – the last Friday in June – the value of the U.S. dollar jumped 0.57% against its Canadian counterpart, its biggest move in a month.[6] Such recurring spikes, along with a rise in transactions around the WM/Reuters "fix," are evidence that traders are manipulating the rates used to value trillions of dollars of investments.

---

[4]     "Banging the close" and trading ahead are basically identical. Trading ahead is the practice of a dealer trading in front of his or her clients based on information or orders received by that client, which allows a dealer to profit or avoid losses. Trading ahead here occurred when defendants moved trades ahead of client orders and rigged WM/Reuters rates by pushing through trades before and during the 60-second windows when the benchmarks are set.

[5]     Bloomberg LP distributes market information and the WM/Reuters rates on the same Bloomberg terminals used by traders and dealers to engage in chat rooms and send instant messages.

[6]     *See Currency Spikes at 4 P.M. in London Provide Rigging Clues*, Bloomberg, Aug. 27, 2013.



58. The same pattern – a sudden surge minutes before the 4 p.m. "fix" in London on the last trading day of the month, followed by a quick reversal – occurred 31% of the time across 14 currency pairs over two years, according to data compiled by *Bloomberg*. For the most frequently traded pairs, such as euro/dollar, it happened about 50% of the time.

59. As *Bloomberg* reported, the recurring spikes take place at the same time the WM/Reuters rates are set. Managers and others studying the data say the patterns of trades "look like an attempt by currency dealers to manipulate the rates, distorting the value of trillions of dollars of investments in funds that track global indexes."

60. "Since the major fix-market-making banks know their fixing orders in advance of 4 p.m., they can 'pre-position' or take positions for themselves prior to the attempt to move prices in

their favor," Michael Melvin and John Prins wrote in "Equity Hedging and Exchange Rates at the London 4 P.M. Fix," an update of a report for a 2011 Munich conference. They also found "the large market-makers are adept at trading in advance of the fix to push prices in their favor so that the fixing trades are profitable on average." Recurring price spikes, particularly during busy times such as the end of the month, often indicate market manipulation.

**Defendants' Concerted Efforts to Manipulate the FOREX Market**

61.     Spot currency trading is conducted in a small and close-knit community. According to a *Bloomberg* report, many of the dealers and traders near each other take the train ride to and from financial centers, and stay in touch over dinner, on weekend excursions or with regular rounds of golf at local clubs. Spot traders simply deal with buy and sell orders and do not need the complex math skills their counterparts on derivatives desks use to extrapolate prices. Developing and maintaining relationships is more important, the traders say.

62.     Personal relationships often determine how well currency traders treat their customers, said a hedge-fund manager who was cited in a *Bloomberg* report. The manager continued by explaining that that is because there is no exchange where trades take place and no legal requirement that traders ensure customers receive the best deals available.

63.     According to Andre Spicer, a professor at the Cass Business School in London who researched the behavior of traders, "The foreign-exchange market has a very strong culture, in which practitioners feel more attached to each other than they do their banks." "It is also dominated by an extremely small group of individuals, often with strong social ties formed by working with each other at some point in the past."

64.     As explained in the *Bloomberg* report,

On one excursion to a private golf club in the so-called stockbroker belt beyond London's M25 motorway, a dozen currency dealers from the biggest banks and several day traders, who bet on currency moves for their personal accounts, drained

beers in a bar after a warm September day on the fairway. One of the day traders handed a white envelope stuffed with cash to a bank dealer in recognition of the information he had received, according to a person who witnessed the exchange.

65.     At the center of defendants' manipulative conduct are instant-message groups and multibank chat rooms with names such as "The Mafia," "The Cartel," "The Bandits' Club" and "One Team, One Dream," in which traders and dealers exchanged information on client orders and agreed how to trade at the fix. The traders used jargon, cracked jokes and exchanged information in the chat rooms as if they did not imagine anyone outside their circle would read what they wrote, according to two people cited by *Bloomberg*, which explained that entry into the chat rooms was coveted by non-member dealers and traders who saw it as a golden ticket because of the influence it exerted.

66.     With a few keystrokes, dealers and traders were able to push around rates to boost bank profits and their own bonuses. The traders and dealers communicated via Instant Bloomberg, a messaging system available on terminals that Bloomberg LP, the parent of Bloomberg News, leases to financial firms, the same terminal which provided information on the WM/Reuters rates.

67.     According to a *Bloomberg* investigation, three senior dealers who participated in "The Cartel" chat room – JPMorgan's Richard Usher, [7] Citigroup's Rohan Ramchandani, and Matt Gardiner who worked at Barclays and UBS – along with at least two other dealers over the years, "would discuss their customers' trades and agree on exactly when they planned to execute them to maximize their chances of moving the 4 p.m. fix, two of the people said. When exchange rates moved their way, they would send written slaps on the back for a job well done."

---

[7]     According to *Bloomberg*, Usher was the moderator of "The Cartel" chat room, and when he quit RBS in 2010, "The Cartel" chat room died. When Usher joined JPMorgan later that same year as chief currency dealer in London, he revived the group with the same participants.

68.    More than a dozen traders at five banks are now either suspended or on leaves of absence in connection with global currency-rigging investigations.  In October 2013, Ramchandani, Citigroup's head of European "spot" foreign-exchange trading, and Usher, JPMorgan's London-based head of spot trading for a group of 10 currencies in the European region, were both placed on leave.  Usher was formerly a trader at RBS before joining JPMorgan in 2010.  Both Ramchandani and Usher served on a committee of senior foreign-exchange executives at banks with big presences in global currency markets.  The group was known as the Bank of England's London Foreign Exchange Joint Standing Committee chief dealers' subgroup and was comprised of a dozen senior traders from different banks who met every three or four months to discuss issues such as foreign-currency regulation and high-frequency trading.

69.    According to *The Wall Street Journal*, Barclays also put six traders on leave on November 1, 2013, including Chris Ashton and Mark Clark in London and Jack Murray in Tokyo, as well as multiple traders in New York.  And RBS suspended two London currencies traders, Julian Munson and Paul Nash, while UBS put on leave Niall O'Riordan, a senior currencies trader in Zurich and the manager of a trading desk that employed a trader who participated in "The Cartel" chat sessions.

70.    On December 20, 2013, *Bloomberg* reported that Goldman Sachs, JPMorgan, RBS and Lloyds Banking Group Plc banned traders from using chat rooms involving traders from more than one other bank.  And Deutsche Bank intends to expand its ban on chat rooms to include its entire investment bank and transaction-banking business.

**Additional Antitrust Allegations**

71.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among defendants and their co-conspirators to fix and/or maintain artificial prices for WM/Reuters-based financial instruments, including Plaintiff's currency trades.

Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

72.     At all relevant times, other corporations, banks, other individuals and entities willingly conspired with defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of and in furtherance of the scheme described herein. The individuals and entities acted in concert by joint ventures and by acting as agents for the principals, in order to advance the objectives of the scheme to benefit defendants and themselves through the manipulation of foreign currency benchmark rates.

73.     In particular, certain individuals and entities agreed and conspired to manipulate the WM/Reuters rates to increase their profits to the detriment of Plaintiff. All averments against named defendants are also averred against these unnamed co-conspirators.

74.     Before June 2013, Plaintiff had not discovered, and could not with reasonable diligence have discovered, facts indicating defendants were engaging in misconduct that caused foreign currency prices to be artificially manipulated during the Class Period. Indeed, defendants had actively sought to conceal the conspiracy.

75.     Plaintiff has suffered significant injury as a result of defendants' foreign currency manipulation conspiracy

76.     In formulating and effectuating the contract, combination, or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to fix, maintain, suppress, inflate, and otherwise make artificial, the price.

77.     Plaintiff suffered antitrust injury in that the return received for currency trades was lower than it would have been had defendants not manipulated the market.

78.     Injury to Plaintiff and the Class also resulted from defendants' deprivation of the

benefits of free and open competition in the market for currency trading. Defendants' manipulation

of WM/Reuters rates affected the prices of trillions of dollars' of currency trades and other

instruments that track global indexes, as well as instruments that are not specifically WM/Reuters-

denominated.

79.     Plaintiff suffered antitrust injury and damages as a result of defendants' actions.

## INVESTIGATIONS

80.     The DOJ has opened a criminal investigation into possible manipulation of the

FOREX market. The U.S. CFTC has also been reviewing possible currency market rigging.

81.     Competition authorities across the globe are also investigating the FOREX market.

British regulators at the FCA are working with regulators worldwide to review the integrity of

benchmarks, including those used in valuing commodities. The FCA sent requests for information

to numerous banks, including Deutsche Bank, Citigroup and RBS. According to news reports, RBS

handed over instant messages to the FCA after determining that a former currency employee's

communication with trading counterparts may have been inappropriate. RBS has opened an

internal investigation into whether currency market trading rules had been breached after the FCA

said it was looking into whether traders at global banks attempted to manipulate the FX markets.

The trader, identified as Richard Usher, now JPMorgan's chief dealer in London and a member of

an elite "chief dealers subgroup," along with senior traders, wrote instant messages while he was at

RBS that U.K. regulators are scrutinizing as part of their investigation of alleged currency

manipulation. The messages to traders at other firms included details of Usher's positions

82.     In addition to Usher, Rohan Ramchandani, Citigroup's head of European spot

trading, Matt  Gardiner, who recently  joined Standard Chartered after working at UBS and

Barclays, and Chris Ashton, head of voice spot trading at Barclays all are said to have used the various chat rooms.

83.     In the United Kingdom, regulators are also investigating the use of private accounts by traders, and investigating allegations that traders may have been trading on their own accounts ahead of client orders.  The FCA asked several banks to investigate whether traders were using certain undeclared personal accounts.  A trader's personal account is generally required to be declared to the bank as well as to his or her superiors.  Each individual trade is then also required to be declared.

84.     FINMA, Switzerland's main market regulator, has also been working closely with authorities in other countries.  Although the precise scope of the Swiss investigation is not yet known, at issue are the "fixes," or daily snapshots discussed above, with the 4:00 p.m. London fix being the most popular fix.  Roughly 1% to 2 % of the $5.3 trillion a day in global currency trading is conducted at the 4:00 p.m. London close.

85.     The European Union's Competition Commissioner, Joaquin Almunia, announced during a live chat on the EU's website that defendants' conduct "could mean violation of competition rules around the possible manipulation of types of exchange rates."

86.     Other investigations around the world have also been launched.  In Asia, the HK-MA and the SG-MA have opened investigations.

87.     To date, at least a dozen FOREX traders and dealers, many of them senior personnel, have been suspended or put on leave by their respective firms.

## COUNT I

### Against Defendants for Violations of §1 of the Sherman Act

88.     Plaintiff incorporates by reference the preceding paragraphs and allegations.

89.     Beginning in or about January 2006 to the present, defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Sherman Act, 15 U.S.C. §1, which directly and foreseeably manipulated the spot prices for FOREX rates.

90.     Defendants' conduct constitutes a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

91.     Defendants agreed to and did abuse their market power over essential areas of commerce involving the setting of daily FOREX benchmark prices.

92.     Defendants entered into the agreements alleged in this Complaint, which had the effect of manipulating the price of the WM/Reuters daily FOREX benchmark, which constituted unreasonable restraints of trade.

93.     This conduct and its resulting impact on the market, occurred in and affected interstate commerce.

94.     As a direct and foreseeable result, Plaintiff and Class members were injured in their property. Absent injunctive relief, these violations may continue or reoccur in the future.

## COUNT II

### Unjust Enrichment Against All Defendants

95.     Plaintiff incorporates by reference the preceding paragraphs and allegations.

96.     Defendants benefited financially from their extensive unlawful acts described herein, including but not limited to working in concert with other FOREX traders and dealers to manipulate the WM/Reuters rates and the "fix" processes for establishing those rates. These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money and transact in the FOREX market at artificial prices.

97. As a result of the foregoing, it would be inequitable and unjust for defendants to be permitted to enrich themselves in this manner.

98. Each defendant, in equity and good conscience, should be required to pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

99. Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief as follows:

A. That the unlawful conduct alleged herein be adjudged and decreed to be in violation of §1 of the Sherman Act, 15 U.S.C. §1;

B. That the Court certifies this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enters an order appointing Plaintiff as the class representative and Plaintiff's counsel as Class Counsel;

C. That the Court enters an order enjoining defendants' challenged conduct, and declaring and adjudging that such conduct is unlawful;

D. That the Court awards damages sustained by Plaintiff and the Class in an amount to be proved at trial, to be trebled according to law, plus interest, including prejudgment interest, attorneys' fees and costs of suit;

E. That the Court awards to Plaintiff and the Class their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

F. That the Court awards any other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by

jury on all issues that can be tried to a jury.

DATED: December 26, 2013        ROBBINS GELLER RUDMAN
                                                        & DOWD LLP
                                                   SAMUEL H. RUDMAN
                                                   DAVID A. ROSENFELD

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
30 Vesey Street, Suite 200
New York, NY 10007
Telephone: 212/693-1058
212/693-7423 (fax)
patc@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
ALEXANDRA S. BERNAY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
bomara@rgrdlaw.com
xanb@rgrdlaw.com

Attorneys for Plaintiff